NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOSEPH AND ANN ENRIGHT, | |
| Plaintiffs, | |
| v. | HONORABLE JEROME B. SIMANDLE |
| | Civil No. 03-4850 (JBS) |
| FARM FAMILY CASUALTY INSURANCE COMPANY, | |
| Defendant. | **OPINION** |

APPEARANCES:

Sally J. Caldwell, Esquire
HARRINGTON & CALDWELL, P.C.
1236-J Brace Road
Cherry Hill, NJ 02034
    Attorney for Plaintiffs

Edward R. Murphy, Esquire
Elizabeth A. Dalberth, Esquire
MURPHY and O'CONNOR, LLP
Commerce Center, Suite 130
1810 Chapel Avenue West
Cherry Hill, NJ 08002-4607
    Attorney for Defendant

**SIMANDLE,** District Judge:

    This matter comes before the Court upon a motion by

Defendant Farm Family Casualty Insurance Company for summary

judgment against plaintiffs Joseph and Ann Enright ("Plaintiff").

For the reasons discussed below, this Court finds that (a) no

reasonable jury could determine that Defendant did not act

properly when it denied the claims under Plaintiff's homeowner's

and contractor's advantage insurance policies at issue in this case or that Defendant's denial of such claims amounted to bad faith, (b) under New Jersey law, any liability for negligent acts of Ken Tomasso, Jr. in this case can not be imputed to Defendant under the doctrine of respondeat superior as claimed by Plaintiff and (c) liability for negligent acts – associated with the allegedly negligent supervision of Tomasso – of Jack Dempsey and Dempsey Weiss and Associates can be imputed to Defendant because Dempsey and Dempsey Weiss and Associates were acting under the express authority of Defendant in their supervision of Tomasso. Accordingly, Defendant's summary judgment motion will be granted in part and denied in part.

## I.  **BACKGROUND**

In 1994, Plaintiffs, Joseph and Ann Enright purchased certain property located at 2120 Delsea Drive in Dennis Township, New Jersey (the "Property"). The property consisted of a main dwelling house and a 2,100 square foot stone and wood framed barn (the "Barn"). In addition to living at the property, Joseph Enright ("Enright") also operated a sheet metal fabrication and restaurant stainless steel and vent cleaning business out of the Barn on the Property. (Pl.'s Amend. Compl. ¶ 7.)

Around the end of December 1999 or the beginning of January of 2000, Enright investigated transferring his property, automobile and business insurance from State Farm Insurance to

Defendant, Farm Family Casualty Insurance Company. (Defendant's Opp. Br. at 29.)  At the advice of an acquaintance, Plaintiff contacted Ken Tomasso Jr., ("Tomasso") an agent for Defendant. (Id.) In early January of 2000, Tomasso visited Plaintiff, inspected the Property, and discussed with Plaintiff his insurance needs. (Id. at 29-30.) Plaintiff testified that, during this visit, Plaintiff told Tomasso that he operated a sheet metal fabrication business in the Barn. (Deposition of Joseph Enright, at 72, Pl.'s Opp. Br. at Ex. 2.) After his visit to the Property, Tomasso wrote nine insurance policies for Plaintiff and his family including commercial and personal automobile insurance policies, a homeowner's insurance policy, a contractor's advantage policy and life insurance for each member of Plaintiff's family. (Id. at 61-62)

Tomasso testified that, in determining the appropriate coverage under Plaintiff's homeowner's insurance policy, Tomasso (1) used Plaintiff's prior State Farm Insurance policy as a guide and (2) employed an insurance tool called the Boeck and Rhodes cost estimator (which estimates the replacement cost of a building based purely on the building's square footage). (Deposition of Ken Tomasso, at 53, 63-67, Pl.'s Opp. Br., Ex. 3.) Tomasso completed the insurance policy applications and sent them to Plaintiff who signed them. (Enright Depo. Tr., p. 62,67.) Soon after, the policies were issued. Of note is the fact that, on

3

Plaintiff's insurance policy issued January 10, 2000, Tomasso
listed Plaintiff's occupation as "contractor," listed Plaintiff's
base of operations as his residence, and listed that Plaintiff
used his garage for tool storage. (Pl.'s Opp. Br. at Ex. 30-33.)
Regarding this fact, Tomasso later stated that Defendant "had no
problem approving" the policy after Plaintiff informed Tomasso
that the Plaintiff stored his tools used in his business in his
garage.[1] (Tomasso Depo. Tr. at 36.)

After the policies were issued, Tomasso sent a request to
Defendant that it amend Plaintiff's homeowner's insurance policy.
(Pl.'s Opp. Br. at Ex. 28.)  Specifically, Tomasso advised
Defendant that, after inspection of the Property, the coverage on
the Barn would need to be increased.[2] (Id.) Tomasso stated that
he decided to increase coverage on the Barn by some $40,000 based
on the Boeck and Rhodes commercial cost estimator he employed but
also testified that he did not go inside or measure the Barn.
(Enright Depo. Tr. at 67.)

_____

[1]   In deposition testimony, Tomasso admitted that if
Plaintiff operated a business from the Barn, the Barn would have
been insured differently.  Tomasso, however, never asked
Plaintiff if he performed contractor activities in the Barn.

[2]   In his deposition, Tomasso testified that he only
realized an increase in coverage was needed after "driving by"
Plaintiff's property in March of 2000. He stated that he realized
after that event that coverage on the Barn was inadequate and had
to be increased.

4

### A.    Plaintiff's Insurance Policies

After Tomasso's meeting with Enright at the Property, Defendant issued a number of insurance policies to Enright including homeowners, business, auto, "contractor's advantage," and life insurance policies.  The present dispute centers only on Plaintiff's homeowner's and contractor's advantage insurance policies.

### 1.    Plaintiff's Homeowner's Insurance Policy

In February of 2000, Defendant issued homeowner's insurance policy number 2905II2229 to Plaintiff.  The policy provided coverage for Plaintiff's home, the Barn, his personal property, and for any "loss of use" of certain personal property. (Homeowner's Policy, ¶ A-D, Def.'s Br. at Ex. B.) Specifically at issue in this case is Section B of Plaintiff's homeowner's policy which provided coverage for "Other Structures" on the premise that are set apart from the insured's Plaintiff's home. (Id. ¶ B.) As discussed above, coverage for "Other Structures" was originally covered in the amount of $22,600 but this amount was increased to $41,600 upon Tomasso's request after his inspection.[3] (Pl.'s Opp. Br. at Ex. 28.) Of note are two additional provisions of Section B. (Def.'s Br. at Ex. B.)

---

[3]  According to Enright, the $19,000 increase in coverage came as a result of Enright questioning Tomasso about whether the amount of "Other Structure" coverage was "enough."  Plaintiff claims that he "assumed" this amount was appropriate to cover the Barn because Tomasso had set the limit. (Id.)

Section B also contains an exclusion stating that the policy does not "cover other structures...used in whole or in part as a 'business.'" (Homeowner's Policy, ¶ A.) "Business" is defined in the policy as any "trade, profession or occupation." (Id.) In addition, the policy states that the "limit of liability for this coverage will not be more than 10% of the limit of liability that applies" for Plaintiff's home.[4] (Id.)

## 2.   Contractor's Advantage Policy

Defendant also issued Plaintiff a contractor's advantage insurance policy, which covered business personal property up to the policy limit of $12,600. (Contractor's Advantage Policy, Def.'s Br. Ex. L.) Tomasso explained to Plaintiff that the contractor's advantage would have a minimum automatic coverage of $5,000 but that Plaintiff could elect to increase the level of coverage after submitting to Defendant a list of all the business property that Plaintiff would seek to cover under the contractor's advantage policy. (Tomasso Depo. Tr. at 77-81.) Plaintiff completed the inventory list – specifically listing equipment, tools, and other business personal business property –

---

[4]   According to Plaintiff (and disputed by Defendant), Plaintiff stated that he and Tomasso walked through the Barn where, in response to a question, Plaintiff informed Tomasso that all of the equipment, personal property and other items in the barn were valued at approximately $150,000. (Id.) In response, Tomasso allegedly reconfigured the limits of Plaintiff's homeowner's policy to "cover" Plaintiff for the contents of the Barn. (Id.)

6

for use in connection with the contractor's advantage policy, as indicated by Tomasso. (Id. at 143-46.)

## B. The Fire at Plaintiff's Premises and Claims Adjustment under Plaintiff's Insurance Policies.

On the morning of October 11, 2002, Plaintiff's Barn caught fire and was completely destroyed.[5]  On October 12, 2002, Plaintiff faxed to Defendant's Claims Department in Trenton, New Jersey; (1) a completed "Notice of Loss" form and (2) a partial list of damaged business property.   Soon after the fire, Plaintiff retained ABC Public Adjusters ("ABC") in order to assist him in adjusting and submitting claims to Defendant.

With the assistance of ABC, Plaintiff made the following claims under its homeowner's insurance policy (with Defendant paying or denying the claims as listed below):

- Plaintiff made a claim in the amount of $41,600.00 under the homeowner's insurance policy's coverage of "Other Structures." Defendant denied this claim under the homeowner's policy's exclusion for property used in a business on October 22, 2002 after learning that Plaintiff operated his sheet metal fabrication business out of his barn.

- Plaintiff filed a claim in the amount of $4,415.20 for a new water line, fences, lawn and trees.  This claim was paid in full by Defendant.

- Plaintiff filed a claim for lost personal property in the amount of $58,950.00.  Defendant paid a total

---

[5]  Plaintiff believed that the fire was started accidently, perhaps by an independent contractor working for Plaintiff who had returned to the job site to work on his motorcycle without the permission of Plaintiff.

amount of $49,139.60 for the lost personal property
(which, according to Defendant, denotes the depreciated
value of the property).

- Plaintiff's neighbor also made a claim for personal
property under Plaintiff's homeowner's policy in the
amount of $3,264.69.  This claim was paid in full by
Defendant.

Under the contractor's advantage policy, Plaintiff made the

following claims (with Defendant paying or denying the claims as

listed below):

- Plaintiff claimed $1,000.00 for the loss of valuable
papers and $4,310.00 for debris removal.  Both claims
were paid in full by Defendant.

- Plaintiff claimed $11,523.63 under the contractor's
advantage policy for extra expenses related to keeping
Plaintiff's sheet metal business operational.
Defendant paid $5,000.00 as a "settlement" with
Defendant taking the position that such a claim was not
covered by the policy.[6]

---

[6]  Plaintiff's claim was made under the a provision titled
"Extra Expenses."  Specifically, the policy stated that Defendant
will:

> pay necessary Extra Expenses [Plaintiff] incur[s]
> during the "period of restoration" that you would not
> have incurred if there had been no direct physical loss
> or damage to property...caused by or resulting from a
> Covered Cause of Loss.

In addition, the policy states that:

> Extra Expense means expenses incurred: (1) to avoid or
> minimize the suspension of business and to continue
> "operations"...(2) to minimize the suspension of
> business, if you cannot continue "operations"...(3)(a)
> to repair or replace any property; or (b) to research,
> replace or restore the lost information on damaged
> valuable papers and records....

Defendant contends that coverage under the contractor's advantage

- Plaintiff made a claim in the amount of $93,990.00 for lost business personal property under the contractor's advantage policy.  This claim was denied because Plaintiff had already paid out $12,600.00, which was the policy limit.

In sum, Plaintiff seeks indemnity for (1) the estimated amount to rebuild its barn to original specifications ($251,210.22) and for (2) unreimbursed business personal property ($81,390.00).

### C.   Ken Tomasso and his Relationship with Defendant.

Tomasso became licensed to sell insurance in New Jersey in or about September of 1998 after completing a four week class at South Jersey Professional School of Business.  (Depo. Tr. of Ken Tomasso, at 13-14.).  Beginning in late 1998 or 1999, Tomasso began working for Defendant. (Id. at 14.) Prior to this employment, Tomasso had no prior employment or experience in the insurance, real estate, appraisal, or construction industries. (Id.) At the beginning of his employment with Defendant, Plaintiff entered into an Agent Contract (the "Agent Contract") with Defendant and he received two weeks of training by Defendant (Id. at 44-45.).

Under the Agent Contract, Tomasso had limited authority to act on behalf of Defendant. (Agent Contract, ¶ 4-6, Pl.'s Opp. Br. Ex. 6.) Tomasso was specifically authorized to "solicit,

---

policy was for "minimiz[ing] suspension of a business" and not "restor[ing] a business building."

9

maintain and service insurance in accordance with all applicable
laws and regulations and with the limitations and provisions set
forth in this agreement...." (Id. ¶ 1.) Tomasso was not
authorized, however, to bind Defendant to any insurance contracts
and he was required to forward all premiums to Defendant and
forward copies of all applications, binders, policies,
certificates and endorsements to Defendants. (Id.) Moreover,
Tomasso had

> no authority to make, alter, vary, or discharge any
> policy contract, to extend the time for payment of
> premiums, to waive or extend any policy obligation or
> condition, to incur any liability or waive any rights
> on behalf of the [Defendant], to advertise using the
> [Defendant's] name or service marks except as
> specifically authorized by the [Defendant] in writing,
> or to incur any obligation or indebtedness in the name
> of [Defendant.]

(Id.)

Tomasso also had certain obligations under his Agent
Contract with Defendant.  (Id.) For example, Tomasso was required
to give Defendant a right of first refusal to underwrite any
property or casualty insurance policy solicited by Tomasso.[7] (Id.
¶ 2.) If Defendant did not want to underwrite the policy or the
customer Tomasso solicited did not want Defendant as its
insurance company, Tomasso was free to (and, for Plaintiff's life

---

[7]  Tomasso described such a relationship - where the
insurance company has a right of first refusal to underwrite
policies solicited by an agent - as the agent being a "captive
agent." (Tomasso Depo. Tr. at 138.)

insurance policies, in fact did) place the insurance business elsewhere. (Tomasso Depo. Tr. at 98-99, 139-41.)  Under the Agent Contract, Tomasso was responsible for maintaining all necessary licenses and was required to fulfill any minimum production requirement established by Defendant. (Agent Contract ¶ 4.) While Defendant "may invite" him to attend training seminars, Tomasso, and not Defendant was not responsible for his training. (Id. ¶ 3.)

According to the Agent Contract, Tomasso was an independent contractor rather than an employee of Defendant. (Id.) The contracts expressly stated that Tomasso was an independent contractor and not an employee and "[n]othing in [the Contract] shall be construed as creating an employer/employee relationship" between Tomasso and Defendant. (Id.) As such, Tomasso acknowledges in the Agent Contract that he:

> will exercise [his] own judgment as to time, place and
> the manner of soliciting insurance, servicing
> policyholders and otherwise performing his duties in a
> harmonious relationship with [Defendant.]

(Id.) Moreover, under the Agent Contract, Tomasso was "responsible for payment of his self-employment taxes, income taxes and for meeting any other reporting or like requirements instituted by state, federal or local laws, rules and regulation." (Id. ¶ 3.) Tomasso testified that he employed and paid his own staff at his own office. (Depo. Tr. of Tomasso, at

11

30-32.) Tomasso was not paid a salary from Defendant. (Agent Contract ¶6; Depo. Tr. of Tomasso at 21.)  Instead, he was paid "a commission in accordance with the commission schedule and rules...on business submitted by [Tomasso] to [Defendant] and accepted by [Defendant.]" (Agent Contract ¶6.) Such payments were considered "full compensation for all services" rendered by Tomasso and Tomasso was responsible for all expenses, debts or liabilities (including payment of his own errors and omissions policy through Defendant, which was payable to Defendant). (Depo. Tr. of Tomasso at 21.) Further, Tomasso was not provided with any business or contacts upon signing on with Defendant but the Contract stated that all business generated by Tomasso was "owned" by Defendant and must remain with Defendant upon the completion of Tomasso's employment. (Id. ¶ 11.) Moreover, as part of Tomasso's duties, Tomasso was expected to "provide the kind of selling, counseling and prompt services that are essential to the creation and maintenance of multiple-line insurance policyholders for the Company" and was subject to a restrictive covenant, which prohibited Tomasso from contacting the clients he solicited for Defendant for a certain period of time from the date of the end of his relationship with Defendant. (Id. ¶ 3, 13.)

Tomasso's relationship with Defendant ended on December 26, 2001. (Tomasso Depo. Tr. at 27.) Tomasso claims he and Defendant had a dispute related to Defendant's request to "work with" him

to "underwrite his book of business." (Tomasso Depo. Tr., at 86, 94.)

### D.   Dempsey Weiss & Associates and their Relationship with Defendant.

Dempsey began a relationship with Defendant in 1984.   In 1989, Dempsey and another agent, David Weiss, started their present partnership of Dempsey Weiss & Associates ("DWA"). (Deposition Transcript of John Dempsey at 8-9.) Unlike Tomasso, DWA served as "General Agents" to Defendant. (Id. at 11.) As a general agent, DWA had essentially the same duties, authorizations and limitations as Tomasso.[8] (General Agent's Contract, Def.'s at Ex. W.) DWA, however, was authorized to recruit, train and oversee agents that Defendant would assign to DWA. (Id. ¶ 1.) DWA had no authority to appoint agents, however. (Id.) Similar to Tomasso, DWA granted Defendant the right of first refusal to underwrite property and casualty policies solicited by DWA but DWA was not prohibited from placing business elsewhere. (Id.)

Like Tomasso, the contract between DWA and Defendant specifically identified DWA as an independent contractors and not employee of Defendant. (Id. ¶ 3.) Moreover, DWA was paid on commission and responsible for payment of self-employment taxes,

---

[8]   Specifically, DWA had no authority to "make, alter, vary or discharge any policy contract...[or] incur any liability or waive any rights on behalf of [Defendant.]" (General Agent s Contract ¶ 3.)

income taxes, for meetings and other reporting requirements required by insurance regulators. (Id.) Further, DWA's contract with Defendant contained language stating that DWA:

> will exercise [its] own judgment as to time, place and the manner of soliciting insurance, servicing policyholders and otherwise performing his duties in a harmonious relationship with [Defendant.]

(Id.)

Soon after Tomasso severed his relationship with Defendant, Defendant transferred Plaintiff's account (and several hundred others) to DWA to be handled by John Dempsey. (Dempsey Depo. Tr. at 13.) Dempsey had been acting as Tomasso's general agent since April of 2000. (Id.) Between April 2000 and December 2001, Dempsey received numerous complaints from customers and Defendant regarding Tomasso's performance. (Id. at 20.) Plaintiff alleges that after Dempsey became Tomasso's general agent, Dempsey voiced concern about Tomasso's practices to Defendant and knew that Tomasso was writing insurance policies that were contrary to Defendant's underwriting guidelines. (Id. at 22.)

When DWA took over Tomasso's accounts, Tomasso did not physically deliver his account files to DWA's office. After having files replicated from Defendant, DWA began immediately working to resolve problems related to Tomasso's former accounts. (Id. at 27.) Dempsey testified that he handled issues with Tomasso's accounts as they came up and

since Tomasso never turned over his files to Dempsey,
Dempsey had no applications to review. (<u>Id</u>. at 26-27.)
Dempsey then focused on the other accounts he deemed more
complex that he thought could be more problematic. (<u>Id</u>.)
Plaintiff's account did not fit this criteria and therefore,
was not reviewed by either Dempsey or anyone in his office.
(<u>Id</u>. at 29.)

### E.   Procedural History

On October 14, 2003, Plaintiff filed a Complaint with this
Court making four claims. The Complain was later amended on
November 3, 2004.  Plaintiff's first cause of action is for
breach of contract and seeks indemnification for costs associated
with losses suffered due to the Barn fire that Defendant failed
to pay under Plaintiff's homeowner's insurance policy.  Second,
Plaintiff claims bad faith on the part of Defendant in refusing
to pay under Plaintiff's homeowner's insurance policy, using
agents' negligence to minimize losses to Defendant, and that
Defendant's underpayment of insurance proceeds led to Plaintiff's
eventual bankruptcy.  Third, Plaintiff alleges that Defendant is
responsible for the negligence of Tomasso, Defendant's employee,
under the doctrine of respondeat superior.  Fourth, Plaintiff
alleges that Defendant is responsible for the negligence of DWA
under the doctrine of respondeat superior.

The motion, the opposition and the reply papers have been carefully considered, without oral argument pursuant to Rule 78, Fed. R. Civ. P.

## II.  DISCUSSION

### A.  Standard of Review

Defendant moves for summary judgment pursuant to Rule 56(c), Fed. R. Civ. P.  A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552

16

(1999) (quoting <u>Liberty Lobby</u>, 477 U.S. at 255).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Liberty Lobby</u>, 477 U.S. at 250.

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp.</u>, 477 U.S. at 325.

The non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue.  Fed. R. Civ. P. 56(e).  Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions."  <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985), <u>cert</u>. <u>denied</u>, 474 U.S. 1010 (1985) (citation omitted); <u>see</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50.  Thus, if the non-moving party's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment.  <u>Liberty Lobby</u>, 477 U.S. at 249-50; <u>Country Floors</u>, 930 F.2d at 1061-62.

17

**B.    Claim for Damages Under the Homeowner's and
Contractor's Advantage Insurance Policies (Count I)**

Defendant seeks summary judgment on the breach of contract
claim in Count I of Plaintiff's Amended Complaint arguing that
there is no question of fact as to the issue of whether Plaintiff
is entitled to any additional coverage for restoration of
Plaintiff's barn and business property claims. Unfortunately,
Plaintiff's brief does not directly address Defendant's argument
that summary judgment is appropriate on Plaintiff's breach of
contract claim.

Defendant asserts that it has paid out all claims it was
required to under both the homeowner's policy and the
contractor's advantage policy. Specifically, Defendant paid out
the policy limit under the contractor's advantage policy,
including (a) a $4,3100 claim for debris removal, (b) $1,000 for
valuable papers and (c) $5,000 to settle a $11,523.63 claim for
"extra expenses." Under the homeowner's insurance policy,
Defendant paid out claims of (a) $4,415.20 for new water lines,
fences, lawn and trees; (b) $49,139.60 for depreciated value of
Plaintiff's claimed personal property (including a $15,000
advance payment); and (c) a neighbor's claim for personal
property damage of $3,264.69. Defendant argues that it properly
denied Plaintiff's claim under the homeowner's insurance (some
$41,600.00) for restoration of Plaintiff's Barn. Plaintiff's
homeowner's insurance policy provides, in pertinent part:

18

> We cover other structures on the "residence
> premises" set apart from the dwelling by clear
> space....
>
> This coverage does not apply to land, including
> land on which the other structures are located
>
> We do not cover other structures:
>
> 1.    Used in whole or in part for "business"...

(Homeowner's Policy ¶ B.) "Business" is defined in the

homeowner's insurance contract as any "trade, profession or

occupation." (Id. ¶ A.) Thus, according to Defendant, while the

Barn would clearly be covered under the policy's coverage of

"other structures," Defendant is not responsible for paying these

amounts because the Barn also clearly fell into the homeowner's

policy exclusion for structures used in the operation of a

business. (Id.)

    This Court notes that Plaintiff has raised no counter

arguments to Defendant's attempt to obtain summary judgment on

the breach of contract claim under Count I.  Having considered

Defendant's position (and Plaintiff's lack of response), this

Court holds that no issue of material fact exists regarding

Plaintiff's breach of contract claim and that Defendant is

entitled to summary judgment as to this claim. First, Defendant

timely paid out all claims owed under the contractor's advantage

policy up through the policy limit.[9]  Second, this Court agrees

_____

    [9]  The parties may dispute whether Plaintiff's claim for
loss of business personal property in the amount of $93,990,
which did not appear to be accompanied by any receipts or other

19

with Defendant that Defendant timely paid out all claims that it was required to under the homeowner's policy.

Furthermore, under the homeowner's insurance policy Defendant need not pay out claims related to the restoration of the Barn. It is not disputed that Plaintiff operated a sheet metal fabrication business out of the barn. This claim was properly denied by Plaintiff because the barn clearly fell into the exclusion set out in the homeowner's insurance policy for structures used in the operation of a business. Based on these facts and the unambiguous nature of Plaintiff's homeowner's insurance policy, this Court finds that Defendant did not breach its obligations under the homeowner's policy related to claims for the restoration of the Barn.

### C.   Bad Faith Claim (Count II)

Defendant also seeks dismissal of Plaintiff's bad faith claim (Count II of its Amended Complaint).  Defendant argues that Plaintiff has not shown that Defendant acted unreasonably in denying Plaintiff's claim for damage to the Barn and coverage of other personal business expenses. (Def.'s Br. at 18-20.) Plaintiff disagrees, arguing that Defendant's failure to acknowledge the mistakes of its captive agents (Tomasso and DWA), its reliance on negligent conduct of its agents, and its failure

---

documentary evidence, was legitimate.  However, his dispute is of no moment as Defendant has already paid the policy limit of $12,600 to Plaintiff related to Plaintiff's other claims.

to promptly pay Plaintiff constitutes "egregious circumstances" rising to the level of a tort of bad faith.  (Pl.'s Br. at 86-87.)

Where there is a denial of benefits, bad faith is established by showing (1) that no debatable reason exists for such denial or (2) that there has been unreasonable delay in the payment of benefits due under the policy.  G. Kenny and F. Lattal, New Jersey Insurance Law, 5-7:1 (2000).  A plaintiff may only obtain damages for a bad faith denial of benefits if "no debatable reasons existed for denial of the benefits" and for a bad faith postponement of benefits if "no valid reasons existed to delay processing the [insured's] claim and the insurance company knew or recklessly disregarded the fact that no valid reasons supported the delay."  Pickett v. Lloyd's and Peerless Ins. Agency, Inc., 131 N.J. 457, 481 (1993); see also Van Holt v. Liberty Mutual Fire Ins. Co., 163 F.3d 161 (3d Cir. 1998).  This standard "increases the burden on the plaintiff, since it must prove that the insurer acted intentionally rather than just proving that the insurer was unreasonable."  Hudson Univ. Ltd. v. Aetna Ins. Co., 987 F. Supp. 337, 341 (D.N.J. 1997).  Neither negligence nor mistake is sufficient to show bad faith - rather, a plaintiff must demonstrate "that the insurer's conduct is unreasonable and the insurer knows that the conduct is

unreasonable, or that it recklessly disregards the fact that the conduct is unreasonable." Pickett, 131 N.J. at 473.

### 1.   No Debatable Reason Exists for Denial

The "fairly debatable" standard is intended to allow insurers to deny coverage when they have a reasonable basis to believe that no coverage exists for a particular claim. Hudson Univ. Ltd., 98 F. Supp. at 341. Even if the insurer is later held to have been wrong, in such a situation, the insurer "should have the right to litigate [the] claim" and have the "question of law or fact . . . decided before it in good faith is required to pay the claimant." Id. at 341. A plaintiff cannot sustain a claim for bad faith denial or postponement of coverage unless it can establish its substantive claim for coverage as a matter of law. Pickett, 131 N.J. at 474. Here, Plaintiff failed to argue in its opposition brief that Defendant incorrectly denied its claims under the homeowner's insurance policy or the contractor's advantage policy.  As such, Plaintiff failed to establish that it is entitled to payment under such claims (see Part II.B., supra), let alone that Defendant's denial was not reasonable. To the contrary, this Court has concluded that, as a matter of law, Defendant was correct in denying the disputed claims because (a) claims related to the restoration of the barn as an "Other Structure" under the homeowner's policy were clearly excluded under the "used for business" exclusion and (b) claims related to

22

business property were justifiably denied as Defendant had
already paid out claims through the policy limit under the
contractor's advantage policy.  This result also corresponds with
the testimony of Plaintiff's insurance expert Mr. Jay Frank.
(Deposition Transcript of Jay Frank at 34-35.) Specifically, Mr.
Frank testified that, based on the policy language alone,
Defendant was correct in limiting the payments made with respect
to personal property. (Id.) Thus, the Court finds that based on
the plain reading of the contract, Plaintiff's lack of argument
to the contrary and testimony of Plaintiff's expert, no
reasonable jury could conclude that Defendant acted in bad faith
as Defendant unquestionably had, at minimum, a "reasonable basis"
for the denial of benefits.

### 2.  Unreasonable Delay of Benefits Due Under the Policy

An insured can also establish bad faith by showing that no
valid reasons existed for a delay in processing the claim and
that the insurer either knew of, or recklessly disregarded, the
fact that no valid reasons supported the delay. See Pickett, 131
N.J. at 474; see also Kenny and Lattal, New Jersey Insurance Law,
5-7:1.  The Pickett court cited Chester v. State Farm Ins. Co.,
117 Idaho 538 (Idaho Ct. App. 1990), as an example of the type of
delay that could constitute bad faith.  Specifically, the insurer
in Chester allowed eight months to pass before processing the
insured's offer to settle. See Chester, 117 Idaho at 541.  The

Idaho Court of Appeals concluded that the months of inactivity were sufficient to warrant a claim of bad faith.  Id.

No reasonable jury could conclude that the delay in processing Plaintiff's claim in this matter rises to the level of a bad faith delay similar to the facts in Chester. The fire that destroyed the Barn occurred on October 11, 2002.  Defendant's first correspondence with Plaintiff (denying Plaintiff's claim under the homeowner's insurance policy based on the business exclusion) was on October 21, 2002 - only ten days after the fire.  After this initial denial, a representatives from Defendant and Plaintiff (or its adjuster, ABC) were in regular contact until October of 2003.  For example, Defendant wrote to ABC on November 26, 2002 (responding to ABC's letter of November 7), February 12, 2003 (asking for more information in response to ABC's January 13 letter), April 28, 2003 (advising of payment of certain claims following receipt of a proof of loss on March 7), and October 15, 2003 (advising of payment of certain claims following receipt of a proof of loss on October 15).  Thus, Defendant paid out all of the claims that it concluded were covered under the policies between a period of six months to one year after the fire. During such time, Defendant actively communicated with Plaintiff prior to payment of such claims. No reasonable jury could conclude that Defendant's actions rise to the level of the unreasonable delay standard set forth in Chester

24

and adopted by the New Jersey Supreme Court in <u>Pickett</u>.   <u>See</u>
<u>Pickett</u>, 131 N.J. at 474.

Plaintiff raises a number of arguments that Defendant's
conduct constitutes bad faith.   Plaintiff first cites a New
Jersey statute related to unfair claims settlement practices.
(Pl.'s Opp. Br. at 87; N.J. STAT. ANN. 17B:30-13.1.) The statute
describes unfair claims settlement as "failing to acknowledge and
act reasonably promptly upon communications with respect to
claims" and "failing to promptly provide a reasonable explanation
of the basis in the insurance policy in relation to the facts and
applicable law for denial of a claim."   <u>Id</u>.   Although not fully
articulated, Plaintiff appears to be arguing that Defendant's
actions violate these statutory guidelines.

The facts, even when examined in the light most favorable to
Plaintiff, do not support this argument.   The statutory scheme
cited by Plaintiff pertains to life insurance, health insurance
and annuities, and thus, is inapplicable to the present dispute,
which revolves around Plaintiff's homeowner's insurance and
contractor's liability insurance.   <u>See</u> N.J. STAT. ANN. 17B:30-1
("The principal purpose of [this] chapter is to regulate trade
practices in the business of life insurance, health insurance and
annuities....")   Second, Plaintiff cites a section of the New
Jersey Administrative Code related to unfair claim settlement
practice.   In relevant part, Plaintiff states that

> An insurer shall not compel claimants to institute
> litigation to recover an amount due under an insurance
> policy by offering substantially less than amounts
> recovered in actions brought by the claimants, and no
> insurer shall deny payment of a claim when it is
> reasonably clear that either full or partial benefits
> are payable.

Miglicio v. HCM Claim Mgt. Corp., 288 N.J. Super. 331 (1995)

citing N.J. ADMIN. CODE tit. 11 § 2-17.8(h) and (i).  Any

"deviation from the standards [set out in the New Jersey

Administrative Code] may be considered as evidence of bad faith."

Id. The court in Miglicio went on to apply the standard

established in Pickett - namely that a "plaintiff must show the

absence of a reasonable basis for denying benefits of the policy

and the defendant's knowledge or reckless disregard or the lack

of a reasonable basis for denying the claim."  Pickett, 131 N.J.

at 474.  Thus, this Court finds that Plaintiff's arguments

regarding the New Jersey administrative code are unpersuasive and

holds that the standard set forth in Pickett applies to this

case.

### D.   Claim for Negligence of Tomasso and DWA under the Doctrine of Respondeat Superior.

Counts III and IV of Plaintiff's Amended Complaint claim

that Defendant is liable for the negligence of its broker/agents

(Tomasso and DWA) under the doctrine of respondeat superior.

Specifically, Count III claims that Defendant, as "principal,

master and/or employer" of Tomasso, Defendant is responsible for

his failure to provide adequate insurance coverage for

26

Plaintiff's business and non-business property (which Plaintiff claims was negligence on the part of Tomasso) under the doctrine of respondeat superior.  Count IV claims that Defendant is liable for the negligent acts of DWA, who failed to properly supervise Tomasso and timely review Plaintiff's file in order to determine whether they were properly insured.

### 1.    Liability for Acts of Tomasso (Count III)

In its moving papers, Defendant argues that it is entitled to summary judgment because, as a matter of law, Defendant cannot be held liable for the negligence of Tomasso.  Defendant argues that, according to the Agent Contract between Tomasso and Defendant, Tomasso was not an employee of Defendant but an independent contractor, (Def.'s Br. at 21.), and that under New Jersey law, absent special circumstances, the negligence of a non-employee may not be imputed to a principal.  (Id. at 22.) Defendant argues that Tomasso was an independent contractor rather than not an employee and no "special circumstances" existed to make Defendant liable for Tomasso's actions. (Id.) In contrast, Plaintiff argues that summary judgment in favor of Defendant is inappropriate because Tomasso was operating as an agent of Defendant under either express or apparent authority and under New Jersey law, a principal is responsible for the actions of its agent.  Plaintiff also argues that, even if the Court finds that Tomasso is an independent contractor rather than an

employee of Defendant, because he was acting on behalf of Defendant in a capacity expressly authorized in his Agent Contract with Defendant, his negligence can be imputed on Defendant.

The issue of whether an insurance broker's/agent's negligence can be imputed to the insurer centers on (1) the relationship between broker/agent and the insurer and (2) the role that the broker/agent was playing at the time he performed an allegedly negligent act. Under New Jersey law (and as a matter of agency law), the negligence of an <u>employee-agent</u> is imputable to the employer-principal, who must answer for it. <u>Johnson v. Macmillen</u>, 233 N.J. Super. 56, 61 (App. Div. 1989)(emphasis added). However, absent special circumstances, "the negligence of a <u>non-employee agent</u>, i.e., an independent contractor, is not imputed to the principal." <u>Id.</u>(emphasis added); <u>see</u> <u>also</u> <u>JMB Enterprises v. Atlantic Emp. Ins. Co.</u>, 228 N.J. Super. 610 (App. Div. 1988). New Jersey law has "long...recognized that this non-imputation applies in the case of an independent broker placing insurance for a client with an insurance company." <u>Id.</u> <u>(citing</u> <u>Rider v. Lynch</u>, 42 N.J. 465, 475 (1964)).

The Court first tackles the question of whether Tomasso was an employee of Defendant or served as an independent contractor. This Court looks to the Agent Contract, the agreement which

governs the relationship between Tomasso and Defendant.   (Agent
Contract, Pl's Opp. Br. Ex. 6.) As in <u>Johnson</u>, the Agent Contract
expressly states that Tomasso is an independent contractor, not
an employee of Defendant. (<u>See</u> Agent Contract ¶ 3.) Additionally,
Section 3 of the Agent Contract states:

> The Agent understands and agrees that as an Agent he
> will operate as an independent contractor.... [and]
> [n]othing in this Agreement shall be construed as
> creating an employer/employee relationship between the
> Agent and the Company.

(<u>Id</u>.) In addition, under the terms of the Agent Contract, Tomasso
is paid solely on commission by Defendant and pays his self-
employment taxes and income taxes and for all of the expenses
associated with operating his business.   (<u>Id</u>.)   Defendant is not
responsible for Tomasso's training as the Agent Contract states
only that Defendant <u>may</u> invite Tomasso to attend company-
sponsored meetings, training sessions and other programs designed
to develop him as an agent. (<u>Id</u>.)   Tomasso has some degree of
independence from Defendant as he is free to "exercise his own
judgment as to time, place and manner of soliciting insurance,
serving policyholders and otherwise performing his duties" but
must do so "in a harmonious relationship with the Company." (<u>Id</u>.)
Finally, Tomasso is free to place insurance with an insurer other
than Defendant but Defendant has a right of first refusal on all
property and casualty insurance policies which the Tomasso may
seek to place with any insurance company. (<u>Id</u>. at ¶2.)   While the

Agent Contract does contain some provisions that would be suggest an employer-employee relationship (such as a restrictive covenant and the provision stating that Defendant, not Tomasso, owns Tomasso's "book of business" upon the end of the contract), on balance, the agreement is one of an independent contractor and the company he is contracting with, rather than a contract between an employee and employer. (Id.)

Having concluded that Tomasso was an independent contractor, this Court must consider whether "special circumstances" exist or other factors are present so that any negligence of Tomasso can be imputed to Defendant.  See Johnson, 233 N.J. Super. at 61. New Jersey courts have held that, when acting on behalf of an insurer, the negligence of an independent contractor agent or broker, can at times be imputed to the insurer.  See Weinisch v. Sawyer, 123 N.J. 333 (1991).  Thus, it is necessary to determine who the agent/broker was acting on behalf of when he performed the allegedly negligent act.

In many cases, it is not clear-cut whether an insurance broker or agent is acting on behalf of the insured or the insurer. See Mazur v. Selected Risk Ins. Co., 233 N.J. Super. 219 (App. Div. 1989); see also 16 J. Appleman, Insurance Law and Practice § 8725 (1981)(while "an 'insurance agent' represents the company [and] an 'insurance broker' represents the insured...a person may be both an agent and a broker and at different times

30

act in different capacities, sometimes representing the applicant
for insurance and other times acting for the insurance company.")
Thus, a "broker/agent's status is a hybrid one." Johnson, 233
N.J. Super. at 62. When a broker or agent acts for the insurance
company, within the scope of the authority outlined by the terms
of the broker/agent agreement with the company, he is acting as
the insurance company's authorized agent. See Regino v. Aetna
Cas. & Sur. Co., 200 N.J. Super. 94 (App. Div. 1985). Acts done
by a broker/agent in this capacity are to be considered acts of
the company under the principle of respondeat superior.[10] See
id.; see also Johnson, 233 N.J. Super at 62; Mazur, 233 N.J.
Super. at 225. However, when the broker's/agent's action
encompassed by the scope of its agency for the insurer (i.e.,
when a broker evaluates or suggests certain coverage to the
insured), the broker or agent is acting not as the agent of the
insurer but as the agent of the insured (the broker's or agent's

_____

[10]   In Regino v. Aetna Cas. & Sur. Co. a broker was deemed
to be acting as the insurer's agent. Regino, 200 N.J. Super. at
96. There, an independent broker with the authority to bind
coverage telephoned Aetna and bound coverage verbally. Id.  He
then failed to confirm the coverage in writing, as he was obliged
to do by his agency agreement with Aetna. Id. As a consequence,
the policy was never issued. Id. The New Jersey Appellate
Division held that, in this case, the broker's negligence was
imputable to the insurer. Id. at 99. The company was on notice of
its obligation and, in performing the binding function, the
broker was acting within the authorization of the broker
agreement and was acting primarily as the company's agent rather
than the client's. Id.

31

client).[11] <u>Johnson</u>, 233 N.J. Super at 62; <u>see also</u> <u>Rider</u>, 42 N.J.

---

[11]   In <u>Johnson</u>, a case that is factually similar to the present matter, plaintiff was seriously injured in a car accident that was the fault of an under-insured motorist. <u>Johnson</u>, 233 N.J. Super. at 62. After collecting from the other motorist, plaintiff sued his insurance broker (The Puffer Agency) for negligence and the insurer (Selective Risk) under the doctrine of respondeat superior for failing to recommend an underinsured motorist endorsement to Plaintiff's policy. (<u>Id</u>.) The New Jersey Appellate Division set forth the general principle that the negligence of a non-employee agent (an independent contractor) is not imputed to the principal. <u>See</u> <u>id</u>. The court then applied this principle, analyzing the relationship between the agent and insurer finding that their relationship was governed by a contract between them titled "Agency Agreement" which expressly stated that the agent is an independent contractor and that the agency agreement does not create an employer-employee relationship. <u>Id</u>. The court then looked to the agreement which stated that broker had the authority to "bind and execute contracts of insurance" on behalf of the company and to forward to the company and to receive from it a variety of transmittals. <u>Id</u>. The court concluded that the broker/agent's status was a hybrid one – when doing actions authorized in the agency agreement he was serving as the agent of the insurer, but when doing acts traditionally ascribed to an insurance broker, he was acting as the agent of his client, the plaintiff. (<u>Id</u>.)

The court then held that, the function which was negligently performed by the broker – i.e., failure to properly evaluate the insurance needs of the plaintiff – was not one encompassed by the scope of the agency contract with the company and "[r]ather, it was one involving its relationships to its client and was the very function to which <u>Rider</u> ascribed the duty of acting with 'the degree of skill and knowledge requisite to his calling.'" <u>Id</u>. The court continued:

> **That is to say, when Puffer [the agent] undertook to evaluate a client's insurance needs and to make recommendations to him, it was acting not as the agent for any one of the several insurers it represented but only for its own client**. Puffer's actionable negligence here was in failing to recommend a particular available coverage. That act of negligence was not, by application of respondeat superior, an act of negligence by [the insurer.]

at 476 ("When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission.")  Acts of negligence on the part of the broker/agent when performing such tasks will not be imputed to the insurer. See id.; see Rider, 42 N.J. at 476 ("If [the broker/agent] neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he understood to supply...[the agent/broker] bears liability to his principal for the loss sustained thereby.") Further, the mere fact that the contract refers to a party as an "agent" is not enough to hold that that party was acting as an insurers agent as the term is defined legally. See Perry Corp. v. Providence Washington Ins. Co., 1992 WL 233800 at *4 (D.N.J.)

The Mazur court sets out additional policy reasons for its decision not to impute the negligence of an agent or broker to the insurer. See Mazur, 233 N.J. Super. at 227. First, the Mazur court states that public policy mandates that the broker, and not the insurer, should be responsible for the broker's own acts. Id. If this was not the case, "[a]n agent and an insured could conspire to claim that coverage did exist or that a greater level of coverage had been agreed upon...." Id. In addition, the

---

Id. (emphasis added).

33

court stated that a rule favoring "such a blanket indemnification" of agents or brokers would effectively immunize an agent from damages despite his negligence.  Id.

In the present case, Plaintiff alleges that Tomasso was negligent in assessing Plaintiff's insurance needs and evaluating which policy would be correct for them considering Plaintiff's personal and business needs. (Amended Compl. ¶ 11-14.) Specifically, Plaintiff claims that he "relied on [D]efendant's agent Tomasso...to provide proper and adequate coverage for Plaintiff's real estate and personal, business and nonbusiness property."  As a result of Tomasso's "negligent conduct...[D]efendant declared that it owes no duty to indemnify [P]laintiff[] for covered loss to their business property." (Id. ¶ 13), referring to Plaintiff's homeowner's insurance policy and Plaintiff's recommendation of $12,600 policy limit under the contractor's advantage policy). Tomasso's actions - evaluating Plaintiff's insurance needs and advising him on insurance coverage types and amounts - is at the heart of the relationship between the agent and his client. See Rider, 42 N.J. at 475 (ascribing the duty of an agent to act with "the degree of skill and knowledge requisite to his calling.") Following the rule as set forth in Johnson, this Court must find that, the functions that Plaintiff claims Tomasso performed negligently - evaluating Plaintiff's insurance needs and advising him on insurance

coverage types and amounts - were not ones encompassed by the scope of Tomasso's agency for the company.  <u>Johnson</u>, 233 N.J. Super. at 63 (when an agent undertakes "to evaluate a client insured's needs and to make recommendations to him, it was action not as the agent for any one of the several insurers it represented by only for its own client.")  Rather, Tomasso was serving as Plaintiff's agent when evaluating and recommending certain coverage and he alone is liable for his alleged negligence.

The Agency Contract set out specifically what Tomasso is authorized to do on behalf of Defendant.  Tomasso is authorized "to solicit, maintain and service insurance" in accordance with Defendant's policies but Tomasso "has no authority to make, alter, vary or discharge any policy contract...[or] waive or extend any policy obligation or condition..." among other things. (Agent Contract ¶ 1.)  Actions such as evaluating the needs of an insured and advising the insured about what policy and limits are best for their situation are not actions authorized in Tomasso's agent contract on behalf of Defendant.

Plaintiff argues that Tomasso had apparent authority to act on behalf of Defendant and thus, Defendant should be responsible for Tomasso's negligence. (Pl.'s Opp. Br. at 62-70.) Plaintiff states that, under New Jersey law, because Tomasso had either express or apparent authority to act on behalf of Defendant,

35

Defendant bears the responsibility of Tomasso's negligence.  See
Volker v. Connecticut Fire Ins. Co., 22 N.J. Super. 314, 325
(1952)("An insurance company is liable for the acts done or
contract made by one of its agents within the scope of his actual
or apparent authority, as a necessary or reasonable implication
in order to effectuate other authority expressly conferred.")
(Pl.'s Opp. Br. at 63.) According to Plaintiff, Tomasso was
granted express authority to evaluate Plaintiff's insurance needs
and recommend certain policies to Plaintiff under Section 3 of
the Agency Contract which stated that Defendant expects Tomasso
to "provide the kind of selling, counseling and prompt services
that are essential to the creation and maintenance of multiple
line insurance policyholders for the company." (Pl.'s Opp. Br. at
66.) Plaintiff, citing Evangel v. Terzano, argues that this
language is sufficient to create express authority as "an agency
relationship arises when one party authorizes another to act on
its behalf while retaining the right to control and direct any
such acts...." 298 N.J. Super. 467 (1997).

     The Court finds Plaintiff's arguments regarding apparent
authority unpersuasive. First, the case of Volcker v.
Connecticut Fire Ins. Co. cited by Plaintiff does not address the
exact issue presented in this case (i.e., whether the insurer can
be held liable for negligent acts of the insurer's broker or
agent.) Rather, Volcker addresses (1) whether or not the

broker/agent's actions or contracting can bind the insurer or (2)
whether the insurer's direct negligence is actionable.  Volcker,
22 N.J. Super. at 325. Under New Jersey law, these are two
different questions with two distinct lines of case law
controlling each.  Second, the Court finds cases cited by
Plaintiff to be distinguishable from the present situation is
other ways as well.  For example, Plaintiff's citation of Evangel
actually supports Defendant's position.  Evangel states that it
is critical to determine whether an insurance producer is a
broker or an agent of the insurer and "when determining whether a
person is an agent or broker, the power to bind the insurer to
coverage is the critical distinction between broker and agency
status." 298 N.J. Super. at 475-765.  Rather than supporting
Plaintiff's position, Evangel supports Defendant's position
because it suggests that Tomasso was merely a broker for
Defendant and not an agent with authority to act on behalf of
Defendant, because the Agent Contract specifically states that
Tomasso has no authority to "make, alter, vary or discharge any
policy contract...." (Agent Contract ¶1.) Thus, this argument is
unpersuasive.

Plaintiff next argues that under the rule established in
Johnson and Mazur (namely, that a broker/agent's role is a hybrid
one), Tomasso was operating under express authority of the Agent
Contract when he negligently evaluated and advised Plaintiff on

37

his insurance needs.  (Pl.'s Opp. Br. at 68.)  Specifically,
Plaintiff argues that, because the Agency Contract authorizes
Tomasso to "counsel" policyholders, Defendant granted Tomasso the
express authority to evaluate an insured's insurance needs and
advise them on the type of policy best suited for them.  (Id.)
The Court disagrees with Plaintiff's characterization of the term
"counsel" as it is used in the Agent Contract.  Rather than
granting Tomasso express authority to evaluate and advise, the
term counsel is used to generally describe the manner in which
Tomasso should operate his business.  Furthermore, the portion of
the contract that contains the term "counsels" is in Section 3 of
the Agent's Contract - titled "Status of Agent" and addressing
Tomasso's status as an independent contractor – and not Section 1
of the Agent's Contract, which is titled "Authority of Agent" and
specifically laying out the tasks Defendant has and has not
authorized Tomasso to perform on its behalf. (Agent Contract ¶ 1,
3.)

## 2.    Liability for Acts of DWA (Count IV)

The situation involving Defendant's liability for the
allegedly negligent acts of Jack Dempsey and DWA is different
from that of Tomasso.  While Tomasso was an agent of Defendant,
Dempsey was a "general agent" who, under a General Agent
Contract, had both the authority and duty to supervise, train and

38

oversee agents assigned to him.  Beginning in April of 2000,
Dempsey was the general agent in place of Tomasso.

As discussed above absent special circumstances, the
negligence of a non-employee agent (i.e., an independent
contractor) is not imputed to the principal.  Johnson, 233 N.J.
Super. at 61; see also JMB Enterprises v. Atlantic Emp. Ins. Co.,
228 N.J. Super. 610 (App. Div. 1988).  Thus, like Tomasso,
Dempsey's status could also be deemed a hybrid one.  Under
Johnson, when an agent (i) acts for the company and (ii) is
acting within the terms of its agency agreement, "he is then
acting as its authorized agent in such a manner that his acts are
its acts."  Johnson, 233 N.J. Super. at 63.

Here, this Court finds that such "special circumstances"
exist so that actions of a non-employee agent are imputed to the
insurer.  First, Dempsey was acting for the company when he
sought to review and "triage" all of Tomasso's files.  Dempsey
was acting in compliance with his proscribed duties under the
General Agent Contract to "inform [Defendant] of all material
facts of which the General Agent is aware relating to the agents
assigned to him and to the insurance of insureds or proposed
insureds."  (General Agent Contract ¶ 4(h), Def.'s Br. at Ex..
W.)  In addition Dempsey admitted in testimony that he was
working to "triage" files where Tomasso had written policies upon
accepting transfer of Tomasso's files.  (Dempsey Depo. Tr. at 26,

39

Pl.'s Opp. Br. Ex.. 7.) Such actions came after he had voiced
concerns to Defendant's management about Tomasso's business
practices. (Dempsey Depo. Tr. at 20.) In performing such tasks,
Dempsey was clearly working on behalf of Defendant rather than on
behalf of any of the insured (including Plaintiff).  Second, it
is also clear that Dempsey was acting within the terms of the
General Agent Agreement when he took the actions (or failed to
take the actions) Plaintiff is alleging were negligent.
Specifically, Dempsey was "authorize[d]...to train and oversee
[the] agents which [Defendant] shall, from time to time, assign
to" him. There is a genuine dispute of material fact whether
Dempsey negligently failed to train and oversee Tomasso and
Tomasso's files regarding Plaintiff's policies, especially after
Tomasso's shortcomings became known to him and to the Defendant.
A reasonable jury could find that Dempsey was negligent in
failing to obtain and examine Plaintiff's files and that such
negligence caused Tomasso's writing of insufficient insurance
coverage to go undetected at the time of the fire. Thus, under
these circumstances, this Court holds that summary judgment must
be denied to the extent Plaintiff claims that Defendant's general
agent Jack Dempsey and DWA were negligent, since such negligence
in these functions would be imputed to Defendant.

## III. CONCLUSION

For the foregoing reasons, this Court grants Defendant's motion for summary judgment in part as to the breach of contract claim in Count I of plaintiff's Amended Complaint, the bad faith claim in Count II of Plaintiff's Amended Complaint, and the claim of negligence in connection with the actions of Ken Tomasso, Jr. under the doctrine of respondeat superior in Count III of Plaintiff's Amended Complaint. However, this Court denies defendant's motion for summary judgment in part as to the claim of negligence in connection with the actions of Jack Dempsey and Dempsey Weiss Associates under the doctrine of respondeat superior in Count IV of the Amended Complaint.

The accompanying Order is entered.


December 29, 2005
Date

JEROME B. SIMANDLE
United States District Judge

41